Slip Op. 15- 107

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MAVERICK TUBE CORPORATION,** | |
| Plaintiffs, | |
| **TOSÇELIK PROFIL VE SAC ENDÜSTRISI A.Ş., and ÇAYIROVA BORU SANAYI VE TICARET A.Ş.,** | |
| Consolidated Plaintiffs, | |
| **BOOMERANG TUBE LLC, ENERGEX TUBE (A DIVISION OF JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., and UNITED STATES STEEL CORPORATION,** | |
| Plaintiff-Intervenors, | **Before: Jane A. Restani, Judge** |
| v. | **Consol. Court No. 14-00244** |
| **UNITED STATES,** | |
| Defendant, | |
| **BORUSAN ISTIKBAL TICARET A.Ş., BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş., TOSÇELIK PROFIL VE SAC ENDÜSTRISI A.Ş., and ÇAYIROVA BORU SANAYI VE TICARET A.Ş.,** | |
| Defendant-Intervenors. | |

## OPINION

[Commerce's final determination in antidumping duty investigation sustained in part and remanded in part to reconsider constructed value profit margin, and in part, duty drawback.]

Dated: September 24, 2015

Robert E. DeFrancesco, III and Alan H. Price, Wiley Rein, LLP, of Washington, DC, for plaintiff.

David L. Simon, Law Office of David L. Simon, of Washington, DC, for consolidated plaintiffs and defendant-intervenors Tosçelik Profil ve Sac Endüstrisi A.Ş. and Çayirova Boru Sanayi Ve Ticaret A.Ş. With him on the brief were Daniel R. Wilson, Jeffrey S. Grimson, Jill A. Cramer, Kristin H. Mowry, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, DC.

Roger B. Schagrin, John W. Bohn, and Paul W. Jameson, Schagrin Associates, of Washington, DC, for plaintiff-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Jeffrey D. Gerrish, Jamieson L. Greer, and Robert E. Lighthizer, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, for plaintiff-intervenor United States Steel Corporation.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Jessica M. Link, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Donald B. Cameron, Brady W. Mills, Julie C. Mendoza, Mary S. Hodgins, R. Will Planert, and Sarah S. Sprinkle, Morris, Manning & Martin, LLP, of Washington, DC, for defendant-intervenors Borusan Istikbal Ticaret A.Ş. and Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

Restani, Judge:  This matter is before the court on plaintiff Maverick Tube Corporation's ("Maverick"), consolidated plaintiffs Çayirova Boru Sanayi ve Ticaret A.Ş., and Tosçelik Profil ve Sac Endüstrisi A.Ş.'s (collectively "Çayirova"), and plaintiff-intervenor United States Steel Corporation's ("U.S. Steel") motions for judgment on the agency record pursuant to USCIT Rule 56.2.  These parties contest the U.S. Department of Commerce's ("Commerce") final determination in the antidumping ("AD") investigation of oil country tubular goods ("OCTG")[1]

---

[1] The OCTG covered by the investigation are "hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute

(continued. . .)

from the Republic of Turkey ("Turkey").  <u>Certain Oil Country Tubular Goods from the Republic</u>

<u>of Turkey:  Final Determination of Sales at Less Than Fair Value and Affirmative Final</u>

<u>Determination of Critical Circumstances, in Part</u>, 79 Fed. Reg. 41,971 (Dep't Commerce July 18,

2014) ("<u>Final Determination</u>").  The court denies Maverick's and U.S. Steel's motions and grants

Çayirova's motion in part and remands the <u>Final Determination</u> to Commerce for reconsideration

of the calculation of constructed value profit ("CV profit").  The court also grants, in part,

Commerce's request for a remand to reconsider duty drawback.

## BACKGROUND

Following a petition by Maverick, U.S. Steel, and others, Commerce initiated an AD

investigation into OCTG from Turkey.  <u>Certain Oil Country Tubular Goods from India, the</u>

<u>Republic of Korea, the Republic of the Philippines, Saudi Arabia, Taiwan, Thailand, the</u>

---

 (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached."  <u>Certain Oil Country Tubular Goods from the Republic of Turkey: Final Determination of Sales at Less than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part</u>, 79 Fed. Reg. 41,971, 41,971 (Dep't Commerce July 18, 2014) ("<u>Final Determination</u>").  Casing is circular pipe that serves as the structural retainer for the walls of oil and gas wells.  <u>See</u> Issues and Decision Memorandum for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey at 23, A-489-816, (July 10, 2014), <u>available at</u> http://enforcement.trade.gov/frn/ summary/turkey/2014-16873-1.pdf (last visited Sept. 15, 2015) ("<u>I&D Memo</u>"); Tenaris SA Annual Report at Attach. Ex. P 12, PD 239 (May 12, 2014).  It is used to prevent the hole from caving in while drilling is taking place and after the well is completed.  Tenaris SA Annual Report at Attach. Ex. P 12.  Tubing is usually pipe that is smaller in diameter and installed inside larger-diameter casing to conduct the oil or gas from below ground to the surface.  <u>See id.</u> OCTG need to withstand harsh working environments and pressures, and thus they are subject to strict quality requirements.  <u>See</u> <u>I&D Memo</u> at 23.

Also included within the scope of the investigation is OCTG coupling stock.  <u>Final Determination</u>, 79 Fed. Reg. at 41,971.  Excluded from the investigation are casing or tubing containing 10.5% or more by weight of chromium, drill pipe, unattached couplings, and unattached thread protectors.  <u>Id.</u>

Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam:  Initiation of Antidumping

Duty Investigations, 78 Fed. Reg. 45,505 (Dep't Commerce July 29, 2013) ("Initiation Notice").

The period of investigation ("POI") for the Turkish investigation was July 1, 2012, through June

30, 2013.  Id. at 45,506.  After selecting Borusan Manesmann Boru Sanayi ve Ticaret A.Ş. and

Borusan Istikbal Ticaret A.Ş. (collectively, "Borusan"),[2] and Çayirova Bora Sanayi ve Ticaret

A.Ş. and its affiliated exporter Yücel Bora Ithalat-Pazarlama A.S. (collectively, "Yücel"), as

mandatory respondents, Commerce calculated preliminary margins of 0% and 4.87% for

Borusan and Yücel, respectively, and 4.87% for all others.  Certain Oil Country Tubular Goods

From the Republic of Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair

Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of

Final Determination, 79 Fed. Reg. 10,484, 10,486 (Dep't Commerce Feb. 25, 2014)

("Preliminary Determination").

     In calculating dumping margins, Commerce compares the export price[3] and normal

---

[2] Originally both defendant-intervenors Borusan Manesmann Boru Sanayi ve Ticaret A.Ş. and
Borusan Istikbal Ticaret were selected as mandatory respondents, however, record evidence
established that they were affiliated.  See Decision Memorandum for the Preliminary Affirmative
Determination in the Antidumping Duty Investigation of Certain Oil Country Tubular Goods
from the Republic of Turkey at 9, A-489-816, (Feb. 14, 2014), available at
http://enforcement.trade.gov/frn/summary/turkey/2014-04108-1.pdf (last visited Sept. 15, 2015)
("Preliminary I&D Memo").  Commerce thus treated them as one entity for dumping margin
analysis.  Final Determination, 79 Fed. Reg. at 41,973.

[3] Export price is "the price at which the subject merchandise is first sold (or agreed to be sold)
before the date of importation by the producer or exporter of the subject merchandise outside of
the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser
for exportation to the United States."  19 U.S.C. § 1677a(a) (2012).

value.[4]  See 19 U.S.C. § 1677b(a) (2012).  Borusan reported home market sales in excess of 5%

of its U.S. sales and accordingly, in calculating normal value, Commerce used Borusan's home

market sales.  See 19 U.S.C. § 1677b(a)(B)(ii)(II).  Yücel, however, did not have any home

market or third country sales and thus Commerce calculated normal value using constructed

value.  See 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 351.405(a) (2014).  Constructed value is

established by applying a statutory formula, and it includes the sum of the costs of production

plus an amount for profit.  See 19 U.S.C. § 1677b(e); 19 C.F.R. § 351.405(b).  In the Preliminary

Determination, Commerce also granted a duty drawback adjustment to both Borusan and Yücel

by increasing the export price by "the amount of any import duties imposed by the country of

exportation which have been rebated, or which have not been collected, by reason of the

exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B);

Decision Memorandum for the Preliminary Affirmative Determination in the Antidumping Duty

Investigation of Certain Oil Country Tubular Good from the Republic of Turkey 20, A-489-816,

(Feb. 14, 2014), available at http://enforcement.trade.gov/frn/summary/turkey/2014-04108-1.pdf

(last visited Sept. 15, 2015) ("Preliminary I&D Memo").

On July 18, 2014, Commerce issued an affirmative final determination, calculating

margins of 0% for Borusan, 35.86% for Yücel, and 35.86% for all others.  Final Determination,

79 Fed. Reg. at 41,973.  The dramatic increase in Yücel's margin from the Preliminary

Determination to the Final Determination was due to Commerce's decision to calculate CV

---

[4] The normal value of the subject merchandise is defined as "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i) (2012).  Here, normal value is the price at which OCTG products are sold in Turkey.

profit using the financial statement of Tenaris S.A., a multinational OCTG company whose

financial statements Commerce <u>sua</u> <u>sponte</u> placed on the record on May 12, 2014.  <u>See</u> Issues

and Decision Memorandum for the Final Affirmative Determination in the Less than Fair Value

Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey at 2, 20–27, A-

489-816, (July 10, 2014), <u>available at</u> http://enforcement.trade.gov/summary/turkey/2014-16873-

1.pdf (last visited Sept. 15, 2015) ("<u>I&D Memo</u>").  Yücel's margin was also impacted by

Commerce's reduction of its duty drawback adjustment.  <u>Id.</u> at 16–17.

Maverick and U.S. Steel (collectively "petitioners") challenge Commerce's <u>Final</u>

<u>Determination</u> on five grounds.  First, they argue that Borusan's home market sales were part of

an effort to create a "fictitious market" and thus Commerce's reliance on those sales in

calculating Borusan's normal value was not supported by substantial evidence.  Pl. Maverick

Tube Corp.'s Mem. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R. at 10–22, DE 49

("Maverick Br."); Mot. of Pl. United States Steel Corp. for J. on the Agency R. Under Rule 56.2,

DE 46.[5]  Second, they argue that Commerce improperly granted Borusan and Yücel

(collectively, "respondents") duty drawback adjustments.  Maverick Br. at 22–33.  Third, they

contest Commerce's decision not to treat standard J55 OCTG separately from upgradeable J55

OCTG.  <u>Id.</u> at 33–36.  Fourth, they challenge Commerce's decision to reject factual information

showing that Borusan failed to report a potential affiliation.  <u>Id.</u> at 36–41.  Finally, they argue the

inclusion of certain Borusan export price sales in its U.S. sales database was improper because

Borusan knew those sales would be re-exported to a third country.  <u>Id.</u> at 41–46.

---

[5] U.S. Steel did not submit its own brief in support of its motion for judgment on the agency record, rather, it adopted the arguments made in Maverick's motion.

The government and Borusan respond that Commerce properly used Borusan's home market and export price sales, properly analyzed standard and upgradeable J55 together, and properly rejected undisclosed affiliation allegations as untimely.  See Def.'s Resp. in Opp'n to Mots. for J. upon the Administrative R. at 8–35, DE 60 ("Gov. Br."); Resp. Br. of Def.-Intvnrs. Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and Borusan Istikbal Ticaret in Resp. to Pls.' Rule 56.2 Brs. at 12–25, 30–44, DE 63 ("Borusan Resp.").  Borusan argues that Commerce properly granted it a duty drawback adjustment.  Borusan Resp. at 25–29.  The government requests a remand to review the adjustment.  Gov. Br. at 52–54.

Çayirova challenges Commerce's Final Determination on two grounds.  First, Çayirova argues that Commerce improperly denied two-thirds of Yücel's duty drawback adjustment.  Br. of Pls. Çayirova Boru Sanayi ve Ticaret A.Ş. and Tosçelik Profil ve Sac Endüstrisi A.Ş. in Supp. of Their Mot. for J. on the Agency R. at 9–18, DE 45 ("Çayirova Br.").  Second, Çayirova argues Commerce's calculation of its CV profit based on Tenaris's financial statements was not supported by substantial evidence.  Id. at 18–40.  The government also requests a remand to review Yücel's duty drawback adjustments.  Gov. Br. at 52–54.  The government and U.S. Steel argue that Commerce properly relied on Tenaris's financial statements in calculating CV profit margin because Yücel's non-OCTG sales in Turkey were not of the same general category of merchandise as OCTG and using Tenaris's financial statements was a reasonable method of calculating CV profit.  See Gov. Br. at 35–52; U.S. Steel Corp.'s Mem. in Opp'n to the Mot. for J. on the Agency R. Filed By Pls. Çayirova Boru Sanayi ve Ticaret A.Ş. and Tosçelik Profil ve Sac Endüstrisi A.Ş. at 18–23, 27–32, DE 64 ("U.S. Steel Resp.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's AD investigation determination unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Borusan's Home Market Sales

Petitioners challenge Commerce's <u>Final Determination</u> by arguing that Commerce

improperly relied on Borusan's home market sales in calculating normal value.  According to

petitioners, they brought timely allegations that Borusan's home market sales were intended to

create a "fictitious market."  Maverick Br. at 10–14.  With respect to their timeliness argument,

petitioners claim that to require a specific fictitious market allegation as opposed to a general

challenge to the home market would place form over substance.  Pl. Maverick Tube Corp.'s

Reply Br. at 3, DE 81 ("Maverick Reply").  Petitioners further argue that given the limited nature

of oil and gas drilling in Turkey, Borusan had to create a fictitious home market because no

legitimate one existed.  Maverick Br. at 10.  Petitioners argue that the sales were low-volume

sales of limited product variety overruns to a longtime purchaser of scrap for use outside of the

oil and gas exploration industry which matched with precision certain U.S. sales, making them

commercially unreasonable.  <u>Id.</u> at 11–12; Borusan Home Market Sales Verification at 9, PD 240

(May 14, 2014).  These allegations align with petitioners' alternative argument that Borusan's

home market sales were not in the ordinary course of trade.  Maverick Br. at 14–22.

The government and Borusan respond that petitioners' fictitious market allegations were

untimely, unsubstantiated, and that Commerce's decision to rely on Borusan's home market sales

in calculating normal value was supported by substantial evidence.  Gov. Br. at 8; Borusan Resp.

at 12–19.  The government notes that decisions about the viability of the home market must be

made early as it informs the respondent as to which sales must be reported and because the

allegations must be analyzed based on information different from that usually gathered by

Commerce.  Gov. Br. at 10, 11; Uruguay Round Agreements Act, Statement of Administrative

Action, H.R. Doc. No. 103-316, vol. 1, at 821, reprinted in 1994 U.S.C.C.A.N. 4040, 4162

("SAA").[6]  Relative to the merits of the fictitious market allegations, the government cites the

fact that Borusan's home market sales represented more than 5% of its U.S. sales as evidence of

the viability of the home market.  19 U.S.C. § 1677b(a)(1)(B); 19 C.F.R. § 351.404(b)(1).  In

response to petitioners' ordinary course of trade arguments, the government and Borusan argue

that Commerce verified the home market sales and determined that they were legitimate, arm's-

length sales of prime merchandise.  Gov. Br. at 18–21; Borusan Resp. at 3, 19–25.

   A.  Fictitious Market

      A home market is viable, and thus may be used to calculate normal value, if the aggregate

quantity of home market sales of the foreign like product is equal to 5% or more of the aggregate

quantity of U.S. sales of subject merchandise.  19 U.S.C. § 1677b(a)(1); 19 C.F.R.

§ 351.404(b)(2).  Borusan had sales to one customer during the POI representing more than 5%

of Borusan's U.S. sales.  Borusan Home Market Sales Verification at 9–10; Borusan's Suppl.

Sections B & C Response at Ex. A-43, CD 120–126 (Jan. 7, 2014).  Accordingly, the home

---

[6] Under 19 U.S.C. § 3512(d) "[t]he statement of administrative action approved by the Congress
. . . shall be regarded as an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and this Act in any judicial
proceeding in which a question arises concerning such interpretation or application."

market satisfied the viability threshold test based on sales volume.  I&D Memo at 35.

Under 19 U.S.C. § 1677b(a)(2), "no sale or offer for sale intended to establish a fictitious market, shall be taken into account in determining normal value."  The statute gives an example of evidence that may be considered in determining whether sales were intended to create a fictitious market, namely, price movement of different forms of the foreign like product sold in the home market after the issuance of an antidumping duty order, if such price movements appear to reduce the dumping margin.  See 19 U.S.C. § 1677b(a)(2).  The court has determined that this statutory provision is intended to "prevent parties from manipulating dumping margins by either setting up pretend sales, or offering merchandise at a price that does not reflect its actual market price."  PQ Corp. v. United States, 11 CIT 53, 57, 652 F. Supp. 724, 729 (1987). The statutory example was not intended to be exclusive.  Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 126 (1987) ("The purpose of [the amendment including the fictitious market example] is to highlight one particular example of a fictitious market.").  Although Commerce has not expanded the fictitious market analysis beyond the situation described in the statutory example, Borusan's argument that the fictitious market analysis is applicable only after the implementation of an AD duty order is without merit as the statute contemplates other possible scenarios in which a fictitious market could be created.  See 19 U.S.C. § 1677b(a)(2) (stating that evidence of price movement after the issuance of an AD order may be considered as evidence of a fictitious market).

As a preliminary matter, petitioners' fictitious market allegations were untimely. Petitioners challenged Borusan's home market sales early in the investigation, but they did not make a fictitious market allegation until their case brief.  Compare Maverick Tube's Pre-

Preliminary Comments at 2–6, CD 161 (Jan. 28, 2014) (arguing that Borusan's home market

sales were not of prime OCTG or differed from Borusan's U.S. sales products), with Maverick

Tube Case Brief at 5–14, CD 282 (June 11, 2014) (making express fictitious market allegation).

Though there is no statutory deadline for filing fictitious market allegations, the allegations must

be made at an early, information-gathering stage of the investigation because they require

Commerce to perform an extraordinary analysis.  See, e.g., Notice of Final Results of

Antidumping Duty Administrative Review and Determination Not To Revoke Order In Part:

Dynamic Random Access Memory Semiconductors of One Megabyte or Above From the

Republic of Korea, 62 Fed. Reg. 39,809, 39,821–22 (Dep't Commerce July 24, 1997) (rejecting

fictitious market allegations made in case brief as untimely); Issues and Decision Memorandum

for the 2011-2012 Final Results of the Administrative Review on Lightweight Thermal Paper

from Germany at 12, A-428-840, (June 18, 2014), available at http://enforcement.trade.gov/frn/

summary/germany/2014-14243-1.pdf (last visited Sept. 15, 2015) ("LWTP I&D Memo")

(rejecting a fictitious market allegation as untimely when party failed to use the term fictitious

market until after Commerce had completed sales verification).  This is in line with the deadlines

for other allegations concerning the calculation of normal value.  LWTP I&D Memo at 12.

Accordingly, Commerce's rejection of the fictitious market allegations was reasonable.

Unless there is evidence that a sale was not an arm's-length bona fide transaction, there is

no need to perform a fictitious market analysis.  Cf. PQ Corp., 11 CIT at 58, 652 F. Supp. at 729.

Petitioners' allegations were untimely and are insufficient on the merits.  Commerce verified

Borusan's home market sales and determined them to be legitimate, arm's-length sales of prime

merchandise identical to that sold in the United States.  Borusan Home Market Sales Verification

at 9–10.  Additionally, Borusan and the government have provided adequate answers for each of

petitioners' arguments concerning the unrepresentative nature of the home market sales.  The

court credits those arguments as supported by substantial evidence.

     First, Borusan's home market sales pattern was adequately explained during verification

and petitioners' reliance on rumors of an impending AD investigation as motivation is

speculation at best.  Borusan Home Market Sales Verification at 8–10.  Second, that the sales

might have been for use outside of the oil and gas industry is of no moment, as the end use of the

product was not specified in the scope of the investigation.  See Initiation Notice, 78 Fed. Reg. at

45,512.  Third, Commerce verified that the home market sales were of prime merchandise made

through arm's-length transactions making the fact that the sales were to a longtime customer who

typically purchased scrap non-determinative.  Borusan Home Market Sales Verification at 8–10.

Given Commerce's verification of Borusan's home market sales and Commerce's reasonable

interpretation of the circumstances surrounding those sales, Commerce's decision to rely on

Borusan's home market sales is supported by substantial evidence and in accordance with law.

  B.  Ordinary Course of Trade

     Under 19 U.S.C. § 1677(15), the ordinary course of trade, within which home market

sales must be made for normal value calculation purposes, means "the conditions and practices

which, for a reasonable time prior to the exportation of the subject merchandise, have been

normal in the trade under consideration with respect to merchandise of the same class or kind."

See also 19 U.S.C. § 1677b(a)(1)(b)(i).  Commerce has adopted regulations indicating that sales

are not made in the ordinary course of trade when they are "extraordinary for the market in

question."  19 C.F.R. § 351.102(a)(35).  The purpose of requiring sales to be in the ordinary

course of trade is to prevent margins from being based on unrepresentative sales.  Monsanto v.

United States, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988).

Plaintiffs have the burden of proving whether sales used in Commerce's calculations are

outside the ordinary course of trade, Murata Mfg. Co. v. United States, 17 CIT 259, 263, 820 F.

Supp. 603, 606 (1993), and "[a]bsent adequate evidence to the contrary, Commerce will treat

sales as within the ordinary course of trade." NSK Ltd. v. United States, 30 CIT 142, 151, 416 F.

Supp. 2d 1332, 1343 (2006).  The court has held that Commerce has some discretion to

determine what sales are outside the ordinary course of trade because the statute provides "little

assistance in determining what is outside the scope of the definition."[7] U.S. Steel Corp. v.

United States, 953 F. Supp. 2d 1332, 1341 (2013) (quoting NSK Ltd. v. United States, 25 CIT

583, 599, 170 F. Supp. 2d 1280, 1296 (2001)).  Commerce's regulations provide examples of

sales that could be considered outside the ordinary course of trade: "sales or transactions

involving off-quality merchandise or merchandise produced to unusual product specifications,

merchandise sold at aberrational prices or with abnormally high profits, merchandise sold

pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length

price." 19 C.F.R. § 351.102(b)(35).  The test is a totality of the circumstances test in which

Commerce determines which factors may be more or less significant on a case-by-case basis.

See U.S. Steel Corp., 953 F. Supp. 2d at 1342.  The SAA "demonstrates a particular concern

with extraordinary sales that would lead to irrational or unrepresentative results." Id. (internal

quotation marks omitted).

---

[7] The statute provides for two express exclusions, not relevant here, for sales at prices less than
the cost of production and transactions between affiliated parties.  19 U.S.C. §§ 1677b(b)(1),
1677b(f)(2).

Commerce verified that Borusan's home market sales were of prime merchandise made at arm's length and found nothing unusual or unrepresentative in the terms of the sales.  Borusan Home Market Sales Verification at 8–10.  As discussed with respect to the fictitious market allegations, petitioners' arguments about the unrepresentative nature of the sales are unsupported by the evidence as verified by Commerce.  Id.  The court has determined that sales must have extraordinary characteristics before they can be said to be outside the ordinary course of trade, even if a relatively low percentage of sales will have a large impact on the dumping margin.  See U.S. Steel Corp., 953 F. Supp. 2d at 1345–46.  Accordingly, petitioners have not carried their burden of showing that the sales were not made within the ordinary course of trade and Commerce's reliance on Borusan's home market sales in calculating the dumping margin is supported by substantial evidence.  See Murata Mfg. Co., 17 CIT at 263, 820 F. Supp. at 606.

**II.  Standard and Upgradeable J55**

Petitioners next challenge Commerce's decision not to treat standard and upgradeable J55 grade OCTG separately for dumping margin calculation purposes.  Maverick Br. at 33–36. Petitioners argue that the physical, chemical, and mechanical differences, as well as the production techniques, costs, final sales prices and end uses, between standard and upgradeable J55 are significant enough to make Commerce's decision unsupported by substantial evidence. Id. at 34–35.  Petitioners also argue that Commerce's past practice with respect to standard and upgradeable J55 OCTG is inapposite given the relatively new development of upgradeable J55. Maverick Reply at 15–16.  The government and Borusan respond that under API standards, upgradeable J55 meets all the technical specifications of API 5CT, as does standard J55, and accordingly, Commerce's decision to treat the two as one grade is supported by substantial

evidence.  Gov. Br. at 22–25; Borusan Resp. at 30–34.  Borusan also argues that Commerce has

relied upon API grades as a basis for defining identical merchandise in prior OCTG

investigations and notes that Maverick did not challenge the product hierarchy in concurrent

companion OCTG investigations.  Borusan Resp. at 31–32.

To calculate a dumping margin, Commerce first attempts to match U.S. sales of subject

merchandise with home market sales of identical merchandise.  See 19 U.S.C. § 1677(16)(A).

Where Commerce cannot identify identical merchandise, it attempts to match U.S. sales to

similar merchandise.  See 19. U.S.C. § 1677(16)(B)–(C).  In identifying similar merchandise

Commerce uses a model-match methodology based on a hierarchy of product characteristics that

are commercially significant to the merchandise at issue.  See JTEKT Corp. v. United States, 33

CIT 1797, 1805, 675 F. Supp. 2d 1206, 1218 (2009) ("JTEKT I"); Fagersta Stainless AB v.

United States, 32 CIT 889, 893, 577 F. Supp. 2d 1270, 1276 (2008).

Here, Commerce selected ten criteria for matching U.S. sales of subject merchandise with

home market sales, namely, "whether or not seamless or welded, type, grade, whether or not

coupled, whether or not ends are upset, whether or not ends are threaded, nominal outside

diameter, length, heat treatment, and nominal wall thickness."  Preliminary I&D Memo at 17.

Based on these ten criteria, Commerce treated standard and upgradeable J55 as the same grade

for the Final Determination and did not create a separate upgradeable J55 grade for control

number[8] construction purposes.  I&D Memo at 36.  Commerce made this determination because

both standard and upgradeable J55 meet all the requirements for API 5CT J55 grade.  Id.

---

[8] A control number means a unique product, defined in terms of the hierarchy of specified
physical characteristics, identified as identical merchandise for purposes of price comparison.
See Union Steel v. United States, 823 F. Supp. 2d 1346, 1349 (CIT 2012).

There is no statutorily mandated method for matching U.S. products with home market products; accordingly, Commerce has discretion in selecting a methodology and the court reviews that choice for reasonableness.  SKF USA, Inc. v. United States, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (citing Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995)). "Commerce can reasonably rely on industry grading standards to assess commercial significance."  Fagersta, 32 CIT at 898, 577 F. Supp. 2d at 1280.

Preliminarily, petitioners' arguments were not made until after Commerce had issued initial AD questionnaires.  The court has upheld Commerce's decision not to revise model-matching criteria when the request was made "at a time that did not allow Commerce to distribute to the various respondents initial questionnaires that would solicit the necessary information to adopt" the model-matching criteria changes.  JTEKT Corp. v. United States, 37 F. Supp. 3d 1326, 1336 (CIT 2014).  Although petitioners argued that the use of steel grade as a product characteristic might be problematic, petitioners initially did not specifically argue for standard and upgradeable J55 to be broken out into separate grades.  See Petitioners' Comments on Product Characteristics and Model Matching at 3–5, PD 37 (Aug. 5, 2013).  Petitioners did not raise this issue until after Commerce had issued its initial AD questionnaires and after respondents had submitted home market and U.S. sales responses in accordance with Commerce's model-matching criteria.  See Maverick's Comments on Borusan's Response to Initial Sections B&C Questionnaire at 11, PD 95–96 (Nov. 13, 2013).  Petitioners' arguments were thus untimely and Commerce's decision not to revise the model-matching method was reasonable.

Commerce's reliance on API standards in evaluating the product characteristic hierarchy

was also reasonable.  In Fagersta Stainless AB v. United States, the court upheld Commerce's

decision not to modify the model-matching methodology based on a party's arguments that

certain product differences were not fully captured in industry grade designations.  32 CIT at

895–99, 577 F. Supp. 2d at 1279–81.  Because the party challenging the model-match

methodology did not dispute that the products fell within the same industry grade and "placed no

evidence on the record which demonstrates that any relevant industry grading standard reflect a

distinction based on [an additional product characteristic]" Commerce did not create a separate

product characteristic for model-matching purposes.  Id. at 898, 577 F. Supp. 2d at 1279.

Similarly, here, petitioners argue that the existing industry standards do not capture the physical

and chemical differences between standard and upgradeable J55 products.  Maverick's

Comments on Borusan's Response to Initial Sections B&C Questionnaire at 8–10.  Just as in

Fagersta, however, petitioners have failed to place evidence on the record demonstrating that

differences in standard and upgradeable products are reflected in any relevant industry-grading

standard.

        Further, Petitioners' arguments are based mainly on cost differences between standard

and upgradeable J55, but differences in costs do not constitute differences in products in and of

themselves.  Preliminary I&D Memo at 17; Issues and Decision Memorandum for the Final

Results of the Administrative Review of Stainless Steel Wire Rod from Sweden at 11–12, A-

401-806, (Mar. 5, 2008), available at http://enforcement.trade.gov/frn/summary/sweden/E8-

4824-1.pdf (last visited Sept. 16, 2015); Issues and Decision Memorandum for the Antidumping

Investigation of Cold-Rolled Flat-Rolled Carbon Quality Steel Products from Turkey; Notice of

Final Determination ff [sic] Sales at Less Than Fair Value at Model Match cmt. 1, A-489-808,

(Mar. 21, 2000), available at http://enforcement.trade.gov/frn/summary/turkey/00-6992-1.txt

(last visited Sept. 16, 2015).  Petitioners have not put forward evidence establishing that the

difference in costs between standard and upgradeable J55 products is due to differences in the

products that are not captured by the existing model-matching methodology.  Accordingly, it was

reasonable for Commerce to rely on API standards in creating its model-matching methodology

grades and its decision not to modify the methodology is supported by substantial evidence.

### III. Alleged Undisclosed Affiliation

Petitioners next argue that Commerce improperly rejected information regarding an

alleged undisclosed Borusan affiliation.  Maverick Br. at 36–41.  The government and Borusan

respond that Commerce properly rejected the information because it was untimely and did not

establish an affiliation that should have been reported.  Gov. Br. at 25–30; Borusan Resp. at 34–

37.  The government also argues, and petitioners concede, that petitioners' information failed to

comply with Commerce's regulations.  Gov. Br. at 25–27; Maverick Br. at 36; Maverick Reply

at 16–17.

Commerce has "broad discretion [over] the establishment and enforcement of time

limits," Reiner Brach GmbH v. United States, 26 CIT 549, 559, 206 F. Supp. 2d 1323, 1334

(2002), and may "for good cause, extend any time limit."  19 C.F.R. § 351.302(b).  In order for

an untimely extension request to be considered, however, a party must demonstrate the existence

of an "extraordinary circumstance."  See 19 C.F.R. § 351.302(c).  An extraordinary circumstance

is an "unexpected event," which cannot be prevented by "reasonable measures," and which

"[p]recludes a party . . . from timely filing an extension request."  19 C.F.R. § 351.302(c)(2).

Commerce also requires all submissions of factual information to "be accompanied by a written

explanation identifying the subsection of § 351.102(b)(21) [defining various types of factual

information] under which the information is being submitted."  19 C.F.R. § 351.301(b).  Strict

enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion

when Commerce provides a reasoned explanation for its decision.  See Dongtai Peak Honey

Indus. Co. v. United States, 971 F. Supp. 2d 1234, 1242 (CIT 2014).

      On February 26, 2014, Maverick filed a letter alleging that Borusan had failed to disclose

a potential affiliation.  See Maverick's Letter re: Additional Information on Borusan's Alleged

EP Sales at 1–2, CD 191 (Feb. 26, 2014).  Maverick concedes that the letter did not comply with

Commerce's regulations and was untimely filed.  Maverick Br. at 36; Maverick Reply at 16–17.

Instead, Maverick argues there was good cause for the delay in filing the information.  Maverick

Br. at 39–41.

      Commerce's decision to reject the information is supported by substantial evidence.  The

factual information submitted did not identify the type of factual information contained and thus

did not comply with Commerce's regulations.  Memorandum Regarding Rejection of Documents

at 2–3, PD 226 (Mar. 25, 2014).  Further, the submission was untimely.  Id.  Finally, it appears

that Borusan was under no obligation to disclose the alleged affiliation to Commerce in the first

place.  The alleged affiliation does not meet the definition of an affiliation as stated in 19 U.S.C.

§ 1677(33), and referenced in Commerce's questionnaire.  See Borusan Section A Questionnaire

Response at A-13, A-16, CD 17–30 (Sept. 24, 2013).  Borusan thus reasonably limited its

disclosure to affiliations meeting that definition.  Accordingly, Borusan did not fail to provide

Commerce with requested information and Maverick has not made a showing of good cause, let

alone extraordinary circumstances.[9]  Given the broad discretion granted to Commerce in setting

and enforcing time limits, as well as the stated legal effect of noncompliance with filing

regulations, it was hardly unreasonable for Commerce to reject petitioners' submission.

### IV.  US Sales

Petitioners next argue that Commerce should have excluded certain Borusan sales from

its U.S. sales database in calculating its export price.  See Maverick Br. at 41.  Petitioners

contend Commerce should have applied the 'knowledge test'[10] to exclude these sales, as Borusan

knew that the merchandise in question was "ultimately destined for a third country."  Id. at 42.

The government and Borusan respond that the disputed sales were properly included as U.S.

sales because the merchandise was sold to an unaffiliated purchaser and entered for consumption

in the United States.  See Gov. Br. at 31; Borusan Resp. at 38.

In calculating export price, Commerce uses the "price at which the subject merchandise is

first sold . . . to an unaffiliated purchaser for exportation to the United States."  19 U.S.C. §

1677a(a).  In the case at hand, Commerce interpreted "sales for exportation into the United

---

[9] Petitioners cite Certain Welded Carbon Steel Pipes and Tubes from Thailand in support of their argument.  Maverick Br. at 40 (citing Certain Welded Carbon Steel Pipes and Tubes from Thailand:  Preliminary Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 17,590, 17,592 (Dep't Commerce, Apr. 10, 1997)).  That case is readily distinguishable, however, because at verification Commerce discovered an undisclosed affiliation.  Id. at 17,593.  Here, no such discovery was made.

[10] Where a producer attempts to manipulate its dumping margins by not reporting certain sales that end up being consumed in the U.S., Commerce will include such sales "if the producer knew or had reason to know that the goods were for sale to an unrelated U.S. buyer."  Statement of Administrative Action accompanying the Trade Agreements Act of 1979,  1979 U.S.C.C.A.N. 381, 682.  This is commonly known as the "knowledge test," and is applied in order to "identify[] the first party in a transaction chain with knowledge of U.S. destination where there are multiple entities involved . . . prior to importation."  Hiep Thanh Seafood Joint Stock Co. v. United States, 821 F. Supp. 2d 1335, 1339 (CIT 2012).

States" to mean "any sale to an unaffiliated party in which merchandise is to be delivered to a

U.S. destination, regardless of whether any underlying paper work may indicate possible

subsequent export to a third country." I&D Memo at 40.  The court in Hiep Thanh Seafood Joint

Stock Co. v. United States upheld this interpretation.  821 F. Supp. 2d 1335, 1339 (CIT 2012).[11]

Just as in that case, here, Commerce verified that the OCTG at issue were delivered to the United

States, were entered for consumption, and discovered information that at least some of the

OCTG was not subsequently re-exported.  I&D Memo at 40; Borusan U.S. Sales Verification

10–11, CD 278 (May 16, 2014).  Further, as in Hiep Thanh, the "bills of lading detail[ed]

shipment to a U.S. port," and "title transferred in the United States without any arrangements for

further transportation."  Hiep Thanh, 821 F. Supp. 2d at 1340; see I&D Memo at 39–41; Final

Determination Analysis Memorandum for Borusan at 2–3, CD 287 (July 10, 2014).

Accordingly, though some evidence presented indicates that the buyer was located outside of the

United States and that the OCTG were possibly intended for re-exportation, the relevance of

such facts is not clear and Commerce's decision is supported by clearly relevant substantial

evidence.

### V.  Duty Drawback Adjustment

Petitioners' last challenge to Commerce's Final Determination is that Commerce erred in

granting duty drawback adjustments to both Yücel and Borusan.  Maverick Br. at 24–33; U.S.

---

[11] In adopting such an interpretation of sale for "exportation to the United States" in Hiep Thanh,
Commerce also rejected using the knowledge test based on the circumstances of the case.  821 F.
Supp. 2d at 1339–40.  The court upheld Commerce's decision not to apply the knowledge test in
part because it was inappropriate where "there [were] only two entities involved in the sale of the
subject merchandise."  Hiep Thanh, 821 F. Supp. 2d at 1339.  For similar reasons, the knowledge
test is equally inapplicable here.

Steel Resp. at 10–17.  Çayirova also challenges Commerce's duty drawback adjustment on other

grounds and argues that Commerce's error was not in granting Yücel a duty drawback

adjustment, but in calculating the adjustment.  Çayirova Br. at 9–18.  The government requests a

remand to "reconsider its determination" because it "changed certain aspects of its duty

drawback decision between the preliminary and final determinations and did not have the

opportunity to consider the impact of those changes or certain arguments now raised before the

Court."  Gov. Br. at 54.  Although Maverick argues the court should grant the government's

request, Maverick Reply at 13, Çayirova argues against remand and instead urges the court to

address the merits of its duty drawback adjustment arguments.  Çayirova Reply at 1–3.  Borusan

argues that Commerce properly calculated its duty drawback adjustment.  Borusan Resp. at 25–

29.

 In the <u>Preliminary Determination</u>, Commerce granted duty drawback adjustments to both

Borusan and Yücel.  <u>Preliminary I&D Memo</u> at 20.  In the <u>Final Determination</u>, Commerce

granted Borusan's duty drawback adjustment as reported, but significantly reduced Yücel's

adjustment.  <u>I&D Memo</u> at 14–18.  Commerce denied approximately two-thirds of Yücel's duty

drawback adjustment because the Harmonized Tariff Schedule ("HTS") headings under which

the products were reported to Turkish customs appear to be non-OCTG headings in the United

States.  <u>Id.</u> at 15–16.  Commerce thus determined that because the import duties that were

exempted were linked to exports of non-subject merchandise, namely, non-OCTG pipe, Yücel

had not properly proved its right to a duty drawback for those exempted import duties.  <u>Id.</u>

 When an agency requests a remand to reconsider voluntarily a determination that is not

based on an intervening event, the court has discretion over whether to remand.  <u>SKF USA Inc.</u>

v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  Remand is appropriate when the

agency's concern is "substantial and legitimate" and inappropriate where the request is

"frivolous or in bad faith."  Id.  Here, the government's request is not obviously frivolous and

does not appear to be in bad faith, but neither are its reasons for requesting the unlimited remand

as to duty drawback demonstrably substantial and legitimate.  The government asks the court to

allow Commerce to reconsider its determination because it made changes to the duty drawback

adjustments between the preliminary and final determinations.  Gov. Br. at 54.  Such changes are

made in almost every proceeding before Commerce, and substantive changes were made only as

to Yücel.  None of Commerce's changes to the duty drawback adjustments between the

preliminary and final determinations were detrimental to petitioners.  Petitioners have raised no

new arguments in the current proceeding that were not previously raised before Commerce.  See

Maverick Tube's Resubmitted Case Brief at 35–55, CD 282–283 (June 11, 2014) (arguing that

the Turkish system is "lax" and does not properly link exempted imports with exports).

Commerce thus had every opportunity to address petitioners' concerns.

 To receive the benefit of the duty drawback adjustment, respondents must meet

Commerce's two-prong test which determines whether:

> (1) the rebate and import duties are dependent upon one another, or in the context
> of an exemption from import duties, if the exemption is linked to the exportation
> of the subject merchandise; and (2) the respondent has demonstrated that there are
> sufficient imports of the raw material to account for the duty drawback on the
> exports of the subject merchandise.

Allied Tube & Conduit Corp. v. United States, 29 CIT 502, 506, 374 F. Supp. 2d 1257, 1261

(2005) ("Allied Tube II").  The respondent is responsible for proving its entitlement to a

favorable adjustment.  Allied Tube & Conduit Corp. v. United States, 25 CIT 23, 28–29, 132 F.

Supp. 2d 1087, 1093 (2001); see Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed Cir.

1996).  The purpose of the adjustment is to "correct for an imbalance resulting from import

duties that are factored into home market prices but either rebated or not collected for exported

products."  Thai Plastic Bags Indus. Co. v. United States, 774 F.3d 1366, 1369 (Fed. Cir. 2014).

Relative to Borusan, substantial evidence supported Commerce's decision to grant a duty

drawback adjustment and its calculation thereof.  Borusan provided detailed evidence of the

Turkish inward processing regime for exempting duties on imports and Borusan's measures for

linking duty exempted imports to exports of subject merchandise.  See Borusan's Sections B&C

Questionnaire Response at C-41–C-44, CD 33–38 (Oct. 28, 2013); Borusan's Suppl. Sections

B&C Questionnaire Response at 32–33.  Commerce verified that information and found no

discrepancies.  Borusan Home Market Sales Verification at 21–23, CD 275 (May 14, 2014);

Borusan Home Market Sales Verification Exs. at Ex. 14, CD 203–221 (Mar. 14, 2014).

Commerce's determination was also in accordance with previous cases in which it granted duty

drawback adjustments based on the Turkish inward processing regime and for KKDF.[12]  See,

e.g., Allied Tube II, 29 CIT at 506–10, 374 F. Supp. 2d at 1261–64; Issues and Decision

Memorandum for the Final Results of the Antidumping Duty Administrative Review: Welded

Carbon Steel Standard Pipe and Tube Products from Turkey; 2011–2012 at 17–18, A-489-501,

(Dec. 23, 2013), available at http://enforcement.trade.gov/frn/summary/turkey/2013-31344-1.pdf

---

[12] KKDF, is the Turkish acronym given to an ad valorem tax imposed on raw materials financed using short-term foreign currency loans that is exempted if used to finance imports that will subsequently be exported.  Although petitioners argue that this is not an import duty, import duty is not further defined in 19 U.S.C. § 1677a(c)(1)(B).  Commerce's interpretation including KKDF as an exempted import duty is reasonable and thus sustained.  See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844–45 (1984).

(last visited Sept. 16, 2015).  With respect to petitioners' arguments relative to Commerce's

exclusion of the exempted import duties from the costs of production, Commerce verified that

Borusan's raw materials cost included import duties.  See Borusan's Cost Verification Report at

26, CD 276 (May 14, 2014); see also I&D Memo at 17.  Commerce's determination that Borusan

had adequately proved its entitlement to a duty drawback adjustment and the calculation of that

adjustment accordingly is supported by substantial evidence and in accordance with law.  While

Commerce may in the future change its views on which circumstances warrant a duty drawback

adjustment, no error has been demonstrated here and the government has not said what possible

error could exist.  The court considered allowing general reconsideration of the drawback issue

because another aspect of the issue is remanded, but such action would ignore the tri-party nature

of this case and the statutory goal of finality.  See NTN Bearing Corp. v. United States, 74 F.3d

1204, 1208 (Fed. Cir. 1995) (recognizing the "desirability of finality"); Corus Staal BV v. U. S.

Dept. of Commerce, 27 CIT 388, 391, 259 F. Supp. 2d 1253, 1257 (2003) (holding that in

evaluating a request for remand from Commerce, "finality concerns do exist and the agency must

state its reasons for requesting remand").  Out of an abundance of caution, however, the court

allows the government a brief amount of time to tell the court what error it might have made in

this general regard to support its remand request.

   For Yücel, the government's remand request is adequately supported.  Çayirova argues

that even though some of Yücel's products were reported under HTS headings to Turkish

customs which would appear to be non-OCTG headings in the United States, Commerce should

have accepted that the products were OCTG, and because of differences in Turkish HTS

provisions, granted Yücel a duty drawback adjustment for exempted import duties linked to

exports of those products.  It is not clear to the court how Çayirova will support its drawback

adjustment claim as a factual matter, but Commerce did make a determination that Çayirova had

no opportunity to challenge, and Commerce apparently now wishes to consider additional

evidence.  Procedural fairness concerns support the government's request.  Accordingly, the

court denies Çayirova's request to proceed to the merits of its drawback claims and grants this

aspect of the government's request for immediate remand.

**VI. Constructed Value Profit Margin**

Çayirova also argues that Commerce's use of Tenaris's profit to calculate CV profit is

unsupported by substantial evidence and unlawful.  Çayirova Br. at 18–40.  Çayirova contends

that Commerce should have used either the profit earned by Yücel on its home market sales of

non-OCTG products or a ranged valued based on Borusan's profit on home market sales of

OCTG products.  Çayirova Br. at 19 n.4, 26–31; Çayirova Reply at 10–11.  Çayirova asserts that

Commerce's determination that the line pipe and standard pipe sold by Turkish producers and

Yücel in the Turkish market were not in the same general category of products as OCTG, is

unsupported by substantial evidence and contrary to prior Commerce decisions.  Çayirova Br. at

25–31.  Çayirova argues that Commerce's methodology was flawed because Commerce failed to

compare Yücel's OCTG to its own non-OCTG products and instead relied on a comparison to

OCTG generally.  Id. at 26.  Çayirova also highlights certain features of Tenaris's OCTG

products and business operations that distinguish it and that render Tenaris's profit rate

aberrational and unrepresentative of what Çayirova could expect in selling to the Turkish market.

Id. at 31–40.  Çayirova also argues that any business proprietary information ("BPI") concerns

about using Borusan's profit are mitigated by the use of ranged data.  See id. at 19 n.4.  Finally,

Çayirova notes Commerce failed to apply a profit cap.  Id. at 23–25.  The court addressed

substantially similar arguments in its recent decision in Husteel Co. v. United States, Slip Op.

15-100, 2015 WL 5132123 (CIT Sept. 2, 2015), and for analogous reasons holds that these

arguments have merit.[13]

  A.  Background

  Constructed value is to include "the actual amounts incurred and realized by the specific

exporter or producer being examined . . . for selling, general, and administrative expenses, and

for profits, in connection with the production and sale of a foreign like product, in the ordinary

course of trade, for consumption in the foreign country."  19 U.S.C. § 1677b(e)(2)(A).  If such

data is unavailable, Commerce resorts to one of three statutory alternatives for calculating

appropriate amounts for selling, general, and administrative expenses, and profits:

> (i)      the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii)     the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of

---

[13] The court need not determine whether the parties had an adequate opportunity to respond to Commerce's placement of the Tenaris data on the record, as Commerce's decision otherwise requires remand.

> merchandise that is in the same general category of products as the subject
> merchandise; [i.e., what is commonly referred to as the "profit cap."]

19 U.S.C. § 1677b(e)(2)(B).  The court will refer to these alternatives as "alternative (i),"

"alternative (ii)," and "alternative (iii)," respectively.  As explained in the SAA, the statute does

not create a hierarchy or preference among the alternatives and Commerce has some discretion in

choosing among the alternatives.  SAA, H.R. Doc. 103-316, vol. 1, at 840, 1994 U.S.C.C.A.N. at

4176.  In this case, Commerce determined that the data to calculate a profit figure under

§ 1677b(e)(2)(A) were unavailable and therefore that it had to rely on one of the alternatives

listed in § 1677b(e)(2)(B).  I&D Memo at 20.

　　　　For the Preliminary Determination, Commerce relied on alternative (i) and based CV

profit on Yücel's sales and cost information for products in the same general category as subject

merchandise, namely, non-OCTG products.  Preliminary I&D Memo at 25.  On May 12, 2014,

more than two months after the Preliminary Determination, Commerce placed on the record the

2012 financial statements of Tenaris.  See I&D Memo at 2 & n.7.  The parties commented on the

use of the Tenaris data in their case and rebuttal briefs.  See Maverick Tube's Case Brief at 33–

35; Çayirova Rebuttal Case Brief at 9–14, CD 284 (June 3, 2014).

　　　　For the Final Determination, Commerce relied on the profit stated in the 2012 Tenaris

financial statements to calculate CV profit pursuant to alternative (iii).  See I&D Memo at 20.

Commerce determined that it could not rely on alternative (i), as it had in the Preliminary

Determination, because Yücel's non-OCTG pipe products did not fall within the "same general

category of products" as required to apply alternative (i).  See id. at 24.  In making that

determination, Commerce relied on the fact that OCTG are used in down-hole applications

requiring that they withstand extreme conditions and are sold to the oil and gas exploration

industry. Id. at 22–24. Commerce highlighted the fact that the oil and gas industry had seen an

uptick in activity in demand during the POI. Id. Non-OCTG pipe, such as line pipe and standard

pipe, however, are not used in down-hole applications, and the Turkish producers sold their non-

OCTG pipe products to the Turkish construction industry, which is generally unable and

unwilling to pay the price premium paid in the oil and gas industry, and which had stagnant

activity during the POI. Id. Commerce also noted that OCTG require different grades of steel,

are subjected to different testing and certification requirements, and are generally connected in

ways that are different from non-OCTG products. See id. Commerce then determined that it

could not use alternative (ii) because of BPI concerns relating to the other respondent, Borusan.

Id. at 21. Commerce thus resorted to alternative (iii).

     In considering the various options for calculating CV profit pursuant to alternative (iii),

Commerce determined that the profit reflected in the Tenaris data represented the best

information available. Id. at 26. Commerce rejected using the profitability of certain Turkish

pipe and tube producers because the record evidence contained overall profit figures and

Commerce could not analyze the data further to exclude profits from non-OCTG products. Id. at

25–26. Commerce also rejected using Borusan's producer level financial statements due to BPI

concerns and its public consolidated financials because they reflected operations for products

other than OCTG. Id. at 26.[14] Commerce explained that "[a]s OCTG is a very specialized

premium product used exclusively in the oil and gas exploration industry with significant quality

differences, different end uses, different end customers, and different demand patterns than those

---

[14] Commerce also considered and rejected using profit data on the record from several Indian
OCTG producers. See I&D Memo at 25. No party has suggested that Commerce should have
used the profit contained in any of these financial statements to calculate CV profit.

of non-OCTG pipe, it is important that we rely on a source that closely reflects such a product."

Id.  Commerce selected Tenaris's financial statements as the best available information because

its sales consisted primarily of OCTG and the majority of its OCTG sales were to non-U.S.

customers.  Id.  Commerce further reasoned that "[b]ecause Tenaris is an OCTG producer that

sells a broad range of OCTG, and in virtually every market in which OCTG is sold, we find that

its average profit experience is representative of sales of OCTG across a broad range of different

geographic markets."  Id.

In the Final Determination, Commerce also determined it could not calculate and apply a

profit cap under alternative (iii), because Commerce did "not have home market data for other

exporters and producers in Turkey of the same general category of products."  Id.  This was in

part because the information on the record concerning the profitability of certain Turkish

producers did not isolate OCTG product data.  Id.  Commerce also rejected using Borusan's

information for profit cap purposes based on BPI concerns.  Id. at 26 n.84.

B.  Analysis

Commerce's reliance on the Tenaris 2012 profit margin without a profit cap as the best

available information for calculating CV profit is unsupported by substantial evidence and not in

accordance with law.  Tenaris is a massive multinational producer of predominantly premium

seamless OCTG that had no production or sales in Turkey during the POI.  In the light of the

other record evidence Commerce could have used and in the light of the fact that Commerce did

not even attempt to calculate a profit cap, the calculation of Yücel's CV profit is remanded to

Commerce for reconsideration.

When Commerce used Tenaris's financial statements to calculate CV profit, it relied on

alternative (iii), which provides that Commerce may use

> the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, <u>except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise</u> . . . .

19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).  Commerce determined that it lacked public

record evidence regarding "the amount normally realized by exporters or producers . . . in

connection with the sale, for consumption in the foreign country, of merchandise that is in the

same general category of products as the subject merchandise."  <u>Id.</u>; <u>see</u> <u>I&D Memo</u> at 26–27.

This determination is not supported by substantial evidence.

> The SAA states:

> The Administration also recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available."  This ensures that Commerce can use alternative (3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products.

SAA, H.R. Doc. No. 103-316, vol. 1, at 841, 1994 U.S.C.C.A.N. at 4177.  Even assuming that

Commerce reasonably concluded that the record lacked public data regarding the profit normally

realized by Turkish producers on Turkish sales of merchandise in the same general category of

products, Commerce still was required to attempt to apply a profit cap on the basis of the facts

available.  In <u>Geum Poong Corp. v. United States</u>, the court explained, "[i]f Alternative Three

without the profit cap may be used as 'facts available,' it would seem a 'facts available' profit

cap may also be used."  25 CIT 1089, 1097, 163 F. Supp. 2d 669, 679 (2001).  "Because the

statute mandates the application of a profit cap, Commerce cannot sidestep the requirement

without giving adequate explanation even in a facts available scenario."  Id.; accord Atar, S.r.l. v.

United States, 34 CIT 465, 470, 703 F. Supp. 2d 1359, 1364 (2010), rev'd on other grounds, 730

F.3d 1320 (Fed. Cir. 2013) ("But even the exception for absence of record data does not allow

Commerce to ignore the profit cap requirement entirely when determining constructed value

profit.  Where the record lacks data on profit normally realized by other companies on sales of

the same general category of products, Commerce still must attempt to comply with the profit

cap requirement through the use of facts otherwise available.").[15]  Thus, even when the record

evidence is deficient for the purposes of calculating the profit cap, Commerce must attempt to

calculate a profit cap based on the facts otherwise available, and it may dispense with the profit

cap entirely only if it provides an adequate explanation as to why the available data would render

any cap based on facts available unrepresentative or inaccurate.  See Geum Poong Corp. v.

United States, 26 CIT 322, 324, 193 F. Supp. 2d 1363, 1367 (2002) ("Geum Poong II").

 Here, Commerce failed to provide an adequate explanation as to why it dispensed with

the profit cap requirement.  The entirety of Commerce's discussion regarding the profit cap was

limited to a single paragraph with the crux of its explanation being that it did "not have home

market data for other exporters and producers in Turkey of the same general category of

products."  See I&D Memo at 26–27.  This explanation falls short of the standard expressed in

the court's prior cases, which the court adopts here.  As best the court can determine, Commerce

completely failed to consider the possibility of applying a facts available profit cap, based on an

---

[15] It appears that in arguing against the use of alternative (iii) before the agency, Çayirova stated that there was no evidence on the record from which to calculate a profit cap and therefore Commerce was not permitted to use alternative (iii).  Çayirova Br. at 21–22.  As a statutory requirement, however, Commerce still was required to attempt to calculate a profit cap.

erroneous legal conclusion.  Commerce certainly did not explain why the use of such a profit cap

would render the CV profit unreasonable and unrepresentative for Yücel.  It also did not explain

why the use of a profit cap based on a range derived from Borusan's confidential profit margin

could not be used.

The use of an appropriate profit cap seems especially important in this case.  The goal in

calculating CV profit is to approximate the home market profit experience of a respondent.  See

Geum Poong II, 26 CIT at 327, 193 F. Supp. 2d at 1370.  The profit data imbedded in Tenaris's

financial statements do not appear to be based on any sales or production in Turkey.  Tenaris's

data therefore appear to be relatively poor surrogates for the home market experience.

Additionally, record evidence suggests that Tenaris is a massive producer of OCTG with

production and associated services around the world.  See, e.g., Tenaris SA Annual Report at

Attach. Ex. P 12.  Record evidence also suggests that Tenaris's profits are among the highest in

the world and that this profit figure is due in large part to Tenaris's sales of unique, high-end,

seamless OCTG products and global services.  See id. at 19–20.  Çayirova, on the other hand,

appears to be rather modest in comparison, both in the size of its operations and in the products

and services it offers; it also produces exclusively welded OCTG.  As Commerce recognized in

the preamble to its own regulations, "the sales used as the basis for CV profit should not lead to

irrational or unrepresentative results."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg.

27,296, 27,360 (Dep't Commerce May 19, 1997); see also Thai I-Mei Frozen Foods Co. v.

United States, 32 CIT 865, 883, 572 F. Supp. 2d 1353, 1368 (2008) ("An unreasonably high

profit estimate will defeat the fundamental statutory purpose of achieving a fair comparison

between normal value and export price."), rev'd on other grounds, 616 F.3d 1300 (Fed. Cir.

2010).  Dispensing with the profit cap requirement entirely in this case could run the risk that the

CV profit rate will be unrepresentative of Çayirova's expected home market experience.

On remand, Commerce is to reconsider the entire issue of CV profit.  If Commerce

continues to calculate CV profit pursuant to alternative (iii), Commerce must either apply a profit

cap or provide an adequate explanation as to why data on the record cannot be used to calculate a

facts available profit cap.  In particular, Commerce must provide explanation beyond BPI

concerns for failing to use a cap based on ranged data from Borusan's home market sales.

C.  Çayirova's Additional Arguments

Because the court is remanding for Commerce to reconsider its calculation of CV profit,

the court deems it premature and inefficient at this point to decide finally the bulk of the other

arguments raised by Çayirova about why the various sources of Turkish data should have been

used instead of the Tenaris data.  These arguments may be rendered moot following remand.

While the court does not specifically resolve Çayirova's claims relative to Commerce's

determination that its non-OCTG products are not in the "same general category of products" as

OCTG products, Commerce must reexamine its determination on remand.  Certain aspects of

Commerce's reasoning supporting its determination that Turkish non-OCTG products are not in

the "same general category of products" as OCTG indicate that Commerce has impermissibly

interpreted that term.  Specifically, Commerce's reliance on the specific market conditions in the

construction industry and oil and gas industry during the POI is misplaced.  Commerce's

reasoning suggests that the weak demand in the construction industry coupled with the strong

demand in the oil and gas industry was an important factor it considered.  See I&D Memo at 24.

Such logic suggests that if the demand dynamics in the two industries during the POI had been

reversed, Commerce's conclusion regarding the same general category of products might have

been different.  This insinuates that products might be within the same general category one year,

but outside that category the next because of general market conditions.  The court doubts that

the general category of products can be defined by such temporary factors.

Further, Commerce's treatment of the testing and certification requirements for OCTG is

problematic.  See id. at 23.  If so-called "non-OCTG" pipe products meet those testing and

certification requirements, it seems that they would be in the same general category as OCTG.

The SAA indicates that the "same general category of products" "encompasses a category of

merchandise broader than the 'foreign like product.'"  SAA, H.R. Doc. No. 103-316, vol. 1, at

840, 1994 U.S.C.C.A.N. at 4176.  Commerce's reasoning suggests that because "non-OCTG"

pipe cannot be classified as OCTG, then it cannot be within the same general category of

products.  If Commerce so concluded, it may have improperly limited the same general category

of products to the foreign like product.[16]  On remand, Commerce must either omit these

---

[16] The court also notes that in the past, Commerce has relied on sales of non-OCTG pipes to
calculate CV profit for OCTG products.  See Oil Country Tubular Goods, Other Than Drill Pipe,
from Korea: Preliminary Results of Antidumping Duty Administrative Review, 72 Fed. Reg.
51,793, 51,796 (Dep't Commerce Sept. 11, 2007) (using financial statement including sales of
non-OCTG products to calculate OCTG CV profit), unchanged in Oil Country Tubular Goods,
Other Than Drill Pipe, from Korea:  Final Results of Antidumping Duty Administrative Review,
73 Fed. Reg. 14,439 (Dep't Commerce Mar. 18, 2008); Certain Oil Country Tubular Goods from
Mexico; Preliminary Results of Antidumping Duty Administrative Review and Partial
Rescission, 71 Fed. Reg. 27,676, 27,679 (Dep't Commerce May 12, 2006) ("[W]e based our
profit calculations and indirect selling expenses on the income statement of Hylsa's tubular
products division, a general pipe division that produces OCTG and products in the same general
category."), unchanged in Notice of Final Results and Partial Rescission of Antidumping Duty
Administrative Review:  Certain Oil Country Tubular Goods from Mexico, 71 Fed. Reg. 54,614
(Dep't Commerce Sept. 18, 2006).  Commerce may depart from past practices for good reason,
but must provide a reasoned explanation for its departure.  See Nippon Steel Corp. v. U.S. Int'l

(continued. . .)

considerations from its analysis or provide an adequate explanation as to why these are

appropriate factors for it to consider in determining which products fall within the same general

category of products as OCTG.

Additionally, the court views as substantial Çayirova's argument that Commerce was

required to compare its specific OCTG and non-OCTG products as opposed to OCTG products

generally in making a "same general category of products" determination.  In choosing between

financial statements available in the record, Commerce weighs "1) the similarity of the potential

surrogate companies' business operations and products to the respondent's business operations

and products; 2) the extent to which the financial data of the surrogate company reflect sales in

the home market and do not reflect sales to the United States; [] 3) the contemporaneity of the

data to the POI . . . [and 4)] the extent to which the customer base of the surrogate and the

respondent were similar."  I&D Memo at 24–25.  "In applying this test, Commerce consistently

takes the position that the greater the similarity in business operations and products, the more

likely that there is a greater correlation in the profit experience of the companies."  Mid

Continent Nail Corp. v. United States, 999 F. Supp. 2d 1307, 1324 (CIT 2014) (internal

quotation marks and alteration omitted).  Because the object of calculating CV profit appears to

be to approximate the experience a respondent would have if it had home market sales of a

foreign like product, reference to some standard OCTG and non-OCTG pipe may be insufficient

in the light of Commerce's mandate to calculate dumping margins as accurately as possible.

Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  On remand

---

Trade Comm'n, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007).  Here, Commerce has not provided an
adequate explanation based on appropriate considerations for such a departure.

Commerce must evaluate CV profit sources based on their suitability for valuing Çayirova's CV profit, rather than their suitability for any OCTG producer.

Finally, on remand, Commerce must provide further explanation for its decision not to rely on alternative (ii).  Although courts have previously upheld Commerce's rejection of alternative (ii) because of BPI concerns, Geum Poong, 25 CIT at 1092, 163 F. Supp. 2d at 674, and Commerce's rejection of ranged data because they were imprecise and did not match the segmented operations reported at issue, Mid Continent Nail, 999 F. Supp. 2d at 1325–26 (upholding Commerce's decision not to rely on ranged public data of confidential profit margin because public version was untimely submitted), Commerce's summary rejection of alternative (ii) requires reexamination.  The government correctly notes that Commerce has discretion in choosing among the alternatives under 19 U.S.C. § 1677b(e)(2)(B), but even when an agency has discretion, "[a]n agency 'must cogently explain why it has exercised its discretion in a given manner.'"  Changzhou Hawd Flooring Co. v. United States, 44 F. Supp. 3d 1376, 1390 (CIT 2015) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 48 (1983)).  Commerce failed to provide adequate reasoning for refusing to consider a ranged profit margin based on Borusan's home market sales as a potential CV profit.  Commerce's single sentence stating that it could not rely on alternative (ii) for BPI concerns falls below the standard set forth in the court's prior decisions.

## CONCLUSION

For the forgoing reasons, Commerce's Final Determination is remanded in part for Commerce to reconsider its calculation of CV profit and its partial denial of Yücel's duty drawback adjustment.  Commerce has until October 1, 2015, to advise the court if it requests

Consol. Court No. 14-00244                                                      Page 38

remand to consider its overall drawback determination and to support such a request with

adequate reasoning.  In all other respects, Commerce's <u>Final Determination</u> is sustained.

Commerce shall have until November 25, 2015, to file its remand results.  The parties shall have

until December 28, 2015, to file objections, and the government shall have until January 27,

2016, to file its response.


                                                    _____/s/ Jane A. Restani_____
                                                          Jane A. Restani
                                                              Judge

Dated: September 24, 2015
          New York, New York